UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AIRPORT MART INC.,

                                        Plaintiff,

                    v.

DUNKIN' DONUTS FRANCHISING LLC,

                                        Defendant.

No. 18-CV-170 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances</u>:

Yenisey Rodriguez-McCloskey, Esq.
Rodriguez-McCloskey PLLC
Brooklyn, NY
*Counsel for Plaintiff*

Ronald D. Degen, Esq.
O'Rourke & Degen, PLLC
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiff Airport Mart, Inc. ("Plaintiff") brings this Action against Defendant Dunkin'

Donuts Franchising LLC ("Defendant") for breach of contract, fraud in the inducement, and

violations of New York General Business Law ("NYGBL") § 349, in connection with a

franchise agreement between the Parties. (Second Amended Complaint ("SAC") (Dkt. No. 26-

1).)[1] Before the Court are Defendant's Motion To Strike Plaintiff's Demand for a Jury Trial and

Request for Lost Profits and Punitive Damages pursuant to Rule 39(a)(2) of the Federal Rules of

---

[1] The operative Complaint in this case is Plaintiff's SAC. Plaintiff initially filed a
motion to amend, (Dkt. No. 25), but Defendant consented to Plaintiff's motion, and the Court
accordingly deemed the proposed SAC submitted, (Dkt. Nos. 26-1 and 29).

Civil Procedure, (Not. of Mot. To Strike (Dkt No. 36)), and Defendant's Motion To Dismiss

pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, (Not. of Mot. To

Dismiss (Dkt. No. 38)). For the reasons stated below, Defendant's Motion To Strike Plaintiff's

Demand for a Jury Trial and Request for Lost Profits and Punitive Damages is granted.

Defendant's Motion To Dismiss is granted in part and denied in part.

## I. Background

### A. Factual Background

Defendant is engaged in franchising Dunkin' Donuts stores throughout the United States

for the sale of donuts, coffee, and related products. (SAC ¶ 8.) Plaintiff and Defendant began

discussing arrangements for Plaintiff to open a Dunkin' store (the "Store") in the Westchester

County Airport ("Westchester Airport"). (*Id.* ¶ 9.)[2]

Plaintiff had an existing positive relationship with the Westchester Airport administration

predating the contractual relationship with Defendant. (*Id.* ¶ 10.) Plaintiff leased and continues

to lease a restaurant, a coffee shop, and a bar at the Westchester Airport. (*Id.*) The Store was

located outside of the TSA area during construction at the Westchester Airport. (*Id.* ¶ 9.)

Plaintiff alleges that it was "always contemplated between the parties that the Store's

location would ultimately move to inside the Westchester Airport's TSA area where maximum

profits could be derived." (*Id.*) Plaintiff alleges that both Plaintiff and Defendant envisioned

entering a long-term contract pursuant to which Plaintiff would operate several Dunkin' Donuts

stores. (*Id.* ¶ 10.)

---

[2] Plaintiff does not allege when these discussions began or what representations exactly were made to Plaintiff regarding where the Store would be located.

On December 30, 2009, Plaintiff entered into a five-year lease agreement (the "Lease") with the Westchester Airport to lease new space for the Store, from January 1, 2010 through December 31, 2014, with a five-year renewal option. (*Id.* ¶ 11.) On June 30, 2010, Plaintiff and Defendant executed a Franchise Agreement. (SAC ¶ 12.) Pursuant to the Franchise Agreement, Plaintiff was authorized to sell Dunkin' Donuts coffee only. (*Id.*) At the time, Plaintiff had a small existing space within the Westchester Airport where it intended to sell coffee in a self-serve area. (*Id.*) Plaintiff alleges that the Franchise Agreement provided that the initial term of the Agreement began ten years from the first date the Store opens. (*Id.* ¶ 13; *see* Mem. of Law in Supp. of Mot. To Dismiss ("Def.'s Mem. re Mot. To Dismiss") Ex. A (Franchise Agreement Signed June 30, 2010 ("Franchise Agreement")) (Dkt. No. 41-1).)[3] Plaintiff alleges that

---

[3] Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). "To go beyond the allegations in the [c]omplaint would convert the . . . motion to dismiss into one for summary judgment . . . ." *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). There are a few notable exceptions to this rule. In addition to the Complaint, a court ruling on a Rule 12(b)(6) motion "may consider . . . any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in [the] plaintiffs' possession or of which [the] plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (alterations and internal quotation marks omitted); *Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same). "To be incorporated by reference, the [c]omplaint must make a clear, definite and substantial reference to the documents." *Thomas*, 232 F. Supp. 2d at 275. Additionally, even if not attached or incorporated by reference, a document upon which the complaint "solely relies and which is integral to the complaint may be considered by the court in ruling on such a motion." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis and internal quotation marks omitted). Documents are "integral" where the plaintiff had to rely on their content "in order to explain what the actual unlawful course of conduct was on which the [d]efendants embarked." *Thomas*, 232 F. Supp. 2d at 276; *see also Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 269 (S.D.N.Y. 2005) (finding documents were integral to the complaint where the plaintiff "relied heavily upon [them] in framing the [c]omplaint"); *Gantt v. Ferrara*, No. 15-CV-7661, 2017 WL 1192889, at *14 (S.D.N.Y. Mar. 29, 2017) (same).

Defendant "represented that this would be a long-term relationship, exceeding the term stated in the Franchise Agreement and that it would assist [Plaintiff] in obtaining additional locations and expanding its business." (SAC ¶ 14.) Plaintiff points to the fact that its affiliated companies operated many gas stations where Dunkin' Donuts products could be sold. (*Id.*)

The Franchise Agreement contains mutual waivers of a trial by jury and lost profits and punitive damages. The Franchise Agreement reads in relevant part: "Waiver of Rights: Both we and you waive and agree not to include in any pleading . . . [a] demand for trial by jury; claims for lost profits; or claims for punitive, multiple, or exemplary damages." (Franchise Agreement at § 15.0.) The signature page of the Franchise Agreement also includes an acknowledgment in bold, capital letters reiterating the waiver provision: "YOU ACKNOWLEDGE SECTION 15 OF THE TERMS & CONDITIONS, WHICH PROVIDES FOR YOUR EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL . . . [AND] TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES . . . ." (Franchise Agreement at Signature Page.)

---

Here, Plaintiff did not attach copies of the various agreements and amendments it references in the SAC, but Plaintiff bases all of its claims on alleged breaches of, and misrepresentations relating to, those agreements and amendments, and references and quotes specific provisions of those documents throughout its SAC. Accordingly, the Court may consider the Franchise Agreement, and the other amendments and agreements that Plaintiff specifically references in the SAC and relies on in bringing its claims. *See Am. Auto. Ins. Co. v. Rest Assured Alarm Sys., Inc*., 786 F. Supp. 2d 798, 803 (S.D.N.Y. 2011) ("Where the claim is for breach of contract, the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiffs' claim." (citation, alteration, and quotation marks omitted)); *Verzani v. Costco Wholesale Corp*., 641 F. Supp. 2d 291, 297–98 (S.D.N.Y. 2009) (same), *aff'd*, 387 F. App'x 50 (2d Cir. 2010).

One attachment the Court specifically will not consider is a Supplier Agreement between Plaintiff and a competitor. (Def.'s Mem. re Mot. To Dismiss Ex. B ("Supplier Agreement") (Dkt. No.41-2).) Although Plaintiff alleges throughout its SAC that it was eventually made to purchase baked goods from a competitor, Plaintiff does not allege entering into any such agreement, and does not base any of its claims on the terms of such an agreement. Accordingly, the Supplier Agreement is not incorporated by reference and the Court will not consider it.

The sale of Dunkin' Donuts coffee was scheduled to commence at the Store in or about January 2010. (SAC ¶ 15.) After Plaintiff was approved as a franchisee, Plaintiff alleges the business came to a standstill. (*Id.* ¶ 16.) Plaintiff alleges that Mike Quinn ("Quinn"), was the point of contact at that time, but that "Quinn was not the right contact for an airport or unique location [franchise]." (*Id.*) Plaintiff alleges that consequently Defendant did not offer the support, equipment, or approval necessary to proceed with the franchise relationship. (*Id.*)

In April 2011, a representative for Plaintiff and Defendant's Vice President of Operations, Bob Wiggins ("Wiggins"), met to discuss the franchise. (*Id.* ¶ 17.) By letter dated April 25, 2011, Plaintiff's representative memorialized the discussion of an expansion of the relationship with Defendant, including a condition that Plaintiff could proceed only if Plaintiff was willing to expand its operations to include "parbaking" at the Westchester Airport. (*Id.*) By email dated April 26, 2011, Wiggins confirmed that the "just baked on demand . . . option" ("JBOD") was available to Plaintiff if Plaintiff secured additional space at the Westchester Airport. (*Id.*)[4] Plaintiff alleges that Defendant, for the first time, required Plaintiff to open a full-service Dunkin' Donuts Store. (*Id.*) Plaintiff agreed because it appeared that the investment could be justified as Plaintiff was in the process of obtaining additional space at Westchester Airport. (*Id.* ¶ 18.)

As a result of these discussions, the Franchise Agreement was amended to require Plaintiff to run a full-service Dunkin' Donuts Store at Westchester Airport. (*Id.* ¶ 19; Def.'s Mem. re Mot. To Dismiss Ex. C (First Amendment to the Franchise Agreement Signed January 20, 2012 ("First Amendment")) (Dkt. No. 41-3).) The First Amendment was executed on January 20, 2012, and in pertinent part provided that "[t]he approved source of bakery supply for

_____

[4] Plaintiff does not define "parbaking" or the "just baked on demand" option.

this Restaurant is: PC # 338698." (First Amendment ¶ 3.) Defendant states that PC # 338698 refers to the Beekman Group, (Mem. re Mot. To Dismiss 3), but nothing in the First Amendment states as much. The First Amendment also included a general release provision that provided in relevant part that Plaintiff released Defendant

> from any and all claims, demands, causes of actions, suits, debts, dues, duties, sums of money, accounts, reckonings, covenants, contracts, agreements, promises, damages, judgments, extents, executions, liabilities and obligations . . . of any kind whatsoever in law or equity . . . [including but not limited to] breach of contract claims or causes of action; claims or causes of action based on fraud or misrepresentation, . . . unfair trade practices (state or federal), and all other claims and causes of action whatsoever.

(First Amendment ¶ 4.)

On November 4, 2010, based on the executed Franchise Agreement, Plaintiff amended the Lease with the Westchester Airport to add 150 additional square feet for the Store and accordingly to increase Plaintiff's annual license fee from $16,109 to $25,559 (the "First Lease Amendment"). (SAC ¶ 20.) On July 9, 2012, Plaintiff and the Westchester Airport executed a second amendment (the "Second Lease Amendment"), which stated in part that "the parties desire to amend the Agreement to increase the Licensed Premises, permit [Plaintiff] to operate as a full-service Dunkin' Donuts franchise, and increase the license fee." (*Id.* ¶ 21.) The Second Amendment added 300 square feet to the leased space, for an additional annual cost to Plaintiff of $18,900. (*Id.* ¶ 22.) Plaintiff alleges it spent in excess of $550,000 to build the Store, improve the location, and make it fit for Defendant's brand. (*Id.* ¶ 23.)

Plaintiff alleges that after it expended significant funds, Defendant disclosed for the first time that Defendant's other franchisees in the area viewed Plaintiff's franchise unfavorably, and Defendant therefore required Plaintiff to purchase certain products from these competing franchises. (*Id.* ¶ 24.) Plaintiff alleges Defendant amended the Franchise Agreement to

authorize JBOD and parbaking onsite, which Plaintiff accepted. (*Id.* ¶ 25.) Plaintiff alleges, however, that Defendant also forced Plaintiff to agree to an amendment stating Plaintiff must purchase all its baked goods—including, significantly, all donuts—from a separate bakery. (*Id.*) Plaintiff alleges that Defendant forced Plaintiff to purchase all baked goods from a competing franchise, Beekman Group LLC ("Beekman Group"), because the Westchester Airport was within "Beekman Group's area." (*Id.* ¶ 31.) This was never disclosed to Plaintiff prior to the signing of the Franchise Agreement. (*Id.*) Plaintiff alleges that Defendant "has similar arrangements with other bakeries, and forces its franchisors elsewhere into similar agreements with similar stores with [which Defendant] does business." (*Id.* ¶ 32.) Plaintiff alleges that this rendered the equipment which Plaintiff was required to buy from Defendant to open the franchise useless, and the expenses for such equipment, which Plaintiff had already paid, a total loss. (*Id.* ¶ 25.)

Plaintiff alleges that because at that point it had invested over $550,000, it continued to improve the leased space, and constructed and finished the Store, which was located in the pre-security area, on the first floor of the Westchester Airport. (*Id.* ¶ 26.) Plaintiff alleges that Defendant's franchisees spend three days on site learning how to run a self-serve coffee franchise, and two weeks taking classes when they become full-service franchises. (*Id.* ¶ 27.) Plaintiff alleges that it was required to spend a total of four weeks of training and to send its President and a second representative, at Plaintiff's expense, to locations in Quincy, Massachusetts, Orlando, Florida, and Great Neck, New York. (*Id.* ¶ 28.) During those training sessions, Plaintiff's representatives learned how to make Dunkin' Donuts coffee and how to finish and decorate the baked goods. (*Id.*) Plaintiff was further required to send two managers for an additional two weeks of classes specifically required for franchisees to learn how to make

coffee, serve customers, and bake through the JBOD system. (*Id.* ¶ 29.) One week of training was in Long Island, New York and one week of training was in Massachusetts. (*Id.*) Plaintiff alleges it lost money on useless training and unnecessary equipment, and that it suffered lost profits from that point forward for the duration of the Franchise Agreement, as it would have been cheaper to parbake the goods inhouse than to purchase them from a competing franchisor. (*Id.* ¶ 30.)

Plaintiff alleges that Defendant's "last-minute requirement on the day of the opening of the Store, that [Plaintiff] agree to purchase all baked goods from Beekman Group caused tension between [Defendant] and [Plaintiff] and [Defendant's] Franchisees and Donut Suppliers." (*Id.* ¶ 33.) Plaintiff also alleges that Defendant represented that these last-minute requests were temporary. (*Id.* ¶ 34.)

In 2014, Westchester Airport issued Requests for Proposals ("RFPs"), seeking alternative vendors to operate within Plaintiff's leased space. (*Id.* ¶ 35.) Prior to that time, it was understood by Plaintiff that renewal of its lease would be routinely granted. (*Id.*) Plaintiff alleges that Defendant refused to assist Plaintiff in securing an extension of the Lease to coincide with the Franchise Agreement terms. (*Id.* ¶ 39.) Defendant refused to provide guidance or even advise Plaintiff as to the RFP and continued operation of the Store under the Agreement. (*Id.*) Defendant allegedly even refused to attend meetings relating to the Store with Plaintiff and Westchester Airport officials. (*Id.*) Plaintiff's requests for assistance were made based on the Franchise Agreement, which provides that Defendant has "experience and skill in the continued development of the Dunkin' Donuts System," involving, among other things, "development" and "operation." (*Id.* ¶ 37.) The Franchise Agreement also provided that Defendant would "maintain a continuing advisory relationship with [Plaintiff], providing such assistance

. . . regarding the development and operation of the Store. . . . [Dunkin'] will advise . . . on all aspects of Store operations." (*Id.* ¶ 38.)

Plaintiff alleges that on March 25, 2015, at a meeting at the Westchester Airport administration offices, Ed Simoes ("Simoes"), Defendant's Director of Operations, refused to meet with Tom Rumbarger ("Rumbarger"), a Westchester County official, and expressed to Plaintiff's representatives that Defendant would not support Plaintiff's franchise. (*Id.* ¶ 40.) Plaintiff submitted an RFP to the Westchester Airport, but Plaintiff's Lease was not renewed. Ultimately, the space was leased to another vendor and Plaintiff was forced to close its Store in that space. Defendant did not support Plaintiff's RFP. (*Id.* ¶ 41.)

In order to save the Store and continue the business pursuant to the Franchise Agreement, Plaintiff attempted to relocate the Store to one of its existing spaces within the Westchester Airport, located past the TSA security checkpoint and still on the first floor. (*Id*. ¶ 42.) Plaintiff was granted a lease by the Westchester Airport which would allow it to do so. (*Id.* ¶ 46.) By letter dated June 30, 2015, Plaintiff submitted a formal relocation plan to Defendant, but Defendant refused to participate in the submission of the relocation plan or to otherwise support Plaintiff in its relocation efforts. (*Id*.) Plaintiff alleges that the Franchise Agreement only specified that the location of the Store needed to be at "Westchester County Airport, 240 Airport Road, White Plains, New York 10604" and not in any specific space within the Westchester Airport. (*Id.* ¶ 43.) Plaintiff alleges that Defendant unjustifiably refused to allow the Store to be moved to the location Plaintiff already secured just steps away within the Westchester Airport. (*Id*. ¶¶ 44, 48.) The new space was allegedly bigger, busier, and only 50 to 100 square feet away. (*Id*.) Plaintiff alleges that even though it diligently worked to remain a franchise partner with Defendant, Defendant terminated the Franchise Agreement, leaving Plaintiff with no

alternatives and no possibility of recouping losses for repairs, improvements, rent, or equipment. (*Id.* ¶ 47.)

Plaintiff alleges that Defendant's refusal to work with, provide guidance to, or advise Plaintiff in securing its existing Lease and its renewal for the Store, prior to the end of the Franchise Agreement's ten-year term, was a material breach of the Franchise Agreement. (*Id.* ¶ 45.) Plaintiff alleges that because of Defendant's breaches and "other wrongs," Plaintiff lost the existing lease where Plaintiff was located, outside of TSA at the lower level, to another vendor. (*Id.*)

Plaintiff's first claim is for breach of contract. Plaintiff alleges Defendant breached the terms of the Franchise Agreement by,

> (a) [f]ailing to comply with the terms of the Franchise Agreement; (b) [f]ailing to assist Plaintiff with an extension of the lease requiring Plaintiff to submit to an RFP; (c) [f]ailing to assist Plaintiff to move the retail store to a space after security checkpoints in the Westchester Airport waiting area; (d) [m]aking derogatory remarks about Plaintiff and its staff to Westchester Airport officials; (e) interfering with the contractual relationship between Plaintiff and the County of Westchester and Westchester Airport; (f) [c]hanging the terms of the Franchise Agreement without consent or permission; (g) [i]mposing unrealistic demands upon Plaintiff . . . ; (h) [c]hanging the plans and layout for the store causing substantial delays in opening; (i) [f]ailing to provide Plaintiff and its employees with proper training, supervision and advice; (j) [f]ailing to provide proper marketing, advertising and support; (k) [u]sing the Plaintiff and the Franchise Agreement to gain advantage with other franchisees; (l) [f]ailing to disclose all material facts to [Plaintiff]; [m] [i]nterfering with and destroying the business relationship between Plaintiff and the County of Westchester and Westchester Airport; (n) [r]efusing to relocate the Dunkin' Donuts store behind security in the Westchester Airport terminal waiting area after making written and oral assurances that Dunkin would support Plaintiff; and (o) [f]ailing to assist Plaintiff in obtaining a renewal of the lease knowing that the Franchise Agreement was for 10 years and the lease for only five years.

(SAC ¶¶ 55(a)–(o).)

Plaintiff's second claim is for fraud in the inducement and intentional misrepresentation. Plaintiff alleges that Defendant misrepresented to Plaintiff that,

(a) Defendant's "skills and expertise would support a successful Dunkin franchise restaurant;" (b) Defendant "would adequately train and support [Plaintiff's] staff and personnel so that they would be able to successfully run a Dunkin franchise restaurant;" (c) Defendant "would assist [Plaintiff's] staff and personnel in establishing and operating a successful Dunkin franchise restaurant; (d) "that the Westchester Airport was a suitable and acceptable location for a successful Dunkin franchise restaurant;" (e) Defendant "would continue to provide support and training to [Plaintiff] and that [Defendant] would continue to do business with [Plaintiff];" (f) Plaintiff "would produce and sell [Plaintiff's] own baked goods by use of baking equipment which [Plaintiff] was required to purchase to operate [Defendant's] franchise store;" and (g) Plaintiff "would be a part of the premier franchise team (i.e. relating to airports and train stations) and not the general business team (dealing with single store franchises); this made it impossible to communicate with the right people making decisions on a day to day basis."

(*Id.* ¶¶ 59(a)–(g) (italics omitted).)  Plaintiff's third claim is for a violation of NYGBL § 349.

Plaintiff alleges Defendant engaged in deceptive acts and practices.  (*Id.* ¶¶ 66–70.)

B.  Procedural Background

Plaintiff filed its initial Complaint on January 9, 2018.  (Compl. (Dkt. No. 1).)  Plaintiff filed a First Amended Complaint ("FAC") on March 23, 2018.  (FAC (Dkt. No. 6).)  On April 25, 2018, counsel for Defendant submitted a pre-motion letter to the Court requesting permission to file a Motion To Dismiss.  (Letter from Ronald D. Degan, Esq., to Court (Dkt. No. 11).)  On April 30, 2018, counsel for Plaintiff submitted a letter opposing Defendant's request for a pre-motion conference.  (Letter from Yenisey Rodriguez-McCloskey, Esq., to Court (Dkt. No. 12).)  On May 9, 2018, the Court scheduled a pre-motion conference.  (Dkt. No. 13.)  That same day, counsel for Defendant submitted a pre-motion letter to the Court requesting permission to file a Motion To Strike Plaintiff's Demand for a Jury Trial and Plaintiff's Request for Lost Profits and Punitive Damages.  (Letter from Ronald D. Degan, Esq., to Court (Dkt. No. 14).)  On May 14, 2018, counsel for Plaintiff submitted a letter opposing Defendant's request.  (Letter from Yenisey Rodriguez-McCloskey, Esq., to Court (Dkt. No. 15).)

On July 3, 2018, the Court held a pre-motion conference and instructed the Parties to submit a briefing schedule. (Dkt. (minute entry for July 3, 2018).) On July 11, 2018, the Court adopted the Parties' proposed briefing schedule. (Dkt. No. 24.) Thereafter, Plaintiff filed a Motion to Amend its FAC, (Dkt. No. 25), but Defendant consented to Plaintiff's Motion, (Dkt. No. 28), and the Court accepted the SAC as submitted on August 14, 2018, (Dkt. No. 29).[5]

On September 12, 2018, Defendant filed its Motion To Strike and accompanying papers, (Not. of Mot. To Strike; Def.'s Mem. re Mot. To Strike), and its Motion To Dismiss and accompanying papers, (Not. of Mot. To Dismiss; Def.'s Mem. re Mot. To Dismiss).[6] On September 29, 2018, Plaintiff filed its Opposition to Defendant's Motion To Dismiss. (Pl.'s Mem. of Law in Opp'n to County's Mot. To Dismiss ("Pl.'s Mem. re Mot. To Dismiss") (Dkt. No. 41).) Thereafter, Defendant consented to granting Plaintiff an extension to respond to its Motion To Strike. (Dkt. No. 47.) On April 29, 2019, Plaintiff filed its Opposition to Defendant's Motion To Strike. (Pl.'s Mem. re Mot. To Strike.) On May 6, 2019, Defendant filed its Reply to Plaintiff's Opposition to the Motion To Strike on. (Def.'s Mem. of Law in Further Supp. of Mot. To Strike ("Def.'s Reply re Mot. To. Strike") (Dkt. No. 51).)

_____

[5] Plaintiff demanded a jury trial in its initial Complaint, (Compl. at 1), but failed to include the same demand in the SAC, (*see* SAC). However, a demand for a jury trial carries through to Plaintiff's SAC because "[a] proper demand [for a jury trial] may be withdrawn only if the parties consent." Fed. R. Civ. P. 38(d). Here, Plaintiff has not consented to withdraw the request. (Mem. of Law in Supp. of Mot. To Strike ("Def.'s Mem. re Mot. To Strike") (Dkt. No. 42); Pl.'s Mem. of Law in Opp'n to County's Mot. To Strike ("Pl.'s Mem. re Mot. To Strike") (Dkt. No. 49).)

[6] Defendant belatedly filed its Memoranda in support of its Motions on September 25, 2019. (*See* Dkt. Nos. 41–42.) However, Defendant had previously filed copies of its Memoranda, along with other incorrectly filed versions of Defendant's Motions. (Dkt. Nos. 30–35, 37.)

## II.  Analysis

### A.  Motion To Strike

Defendant moves pursuant to Rule 39(a)(2) of the Federal Rules of Civil Procedure and based on the waivers in the Franchise Agreement to strike Plaintiff's request for a jury trial and Plaintiff's demand for punitive damages and lost profits.  (Def.'s Mem. re Mot. To Strike 1.)

#### 1.  Jury Trial

Rule 39(a)(2) provides that when a party demands a trial by jury, the action shall be designated as a jury action unless "the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist . . . ."  Fed. R. Civ. P. 39(a)(2).  "[A]s the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver." *Aetna Ins. Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389, 393 (1937) (citations omitted). Nevertheless, "[a]lthough the right is fundamental and a presumption exists against its waiver, a contractual waiver is enforceable if it is made knowingly, intentionally, and voluntarily." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007) (citation omitted).  In considering whether the waiver of a right to a jury trial was knowing and voluntary, courts must consider: "1) the negotiability of contract terms and negotiations between the parties concerning the waiver provision; 2) the conspicuousness of the waiver provision in the contract; 3) the relative bargaining power of the parties; and 4) the business acumen of the party opposing the waiver." *Morgan Guar. Tr. Co. of N.Y. v. Crane*, 36 F. Supp. 2d 602, 603–04 (S.D.N.Y. 1999) (citation omitted); *see also Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 705 (S.D.N.Y. 2011) (same).  "The burden of proving that a waiver was knowing and intentional rests with the party attempting to enforce the purported waiver." *Lehman Bros. Holdings Inc. v. Bethany Holdings Grp., LLC*, 801 F. Supp. 2d 224, 229 (S.D.N.Y. 2011) (citation and quotation

marks omitted). "Although some courts state that jury waivers are construed narrowly, courts have not hesitated to enforce jury waivers as written." *Allied Irish Banks, p.l.c. v. Bank of Am., N.A.*, 875 F. Supp. 2d 352, 356 (S.D.N.Y. 2012). Further, jury waivers are ineffective in the face of allegations of fraudulent inducement only when the plaintiff alleges that the "waive[r] [of the] right to a jury trial was *itself* induced by fraud," not, for example, when the allegations pertain to "the contract as a whole." *Lehman Bros.*, 801 F. Supp. 2d at 230 (emphasis added).[7]

Here, Plaintiff's owner, Sammy El Jamal ("Jamal") has experience leasing spaces at the Westchester Airport; in fact, Jamal and Plaintiff had leased a restaurant, coffee shop, and bar there prior to Plaintiff's dealings with Defendant. (Def.'s Mem. re Mot. to Strike 1 (citing SAC ¶ 10).) This is probative of Jamal's "business acumen," especially regarding leasing spaces at Westchester Airport. *Morgan Guar. Trust Co. of N.Y.*, 36 F. Supp. 2d at 604. Plaintiff's affiliates also hold "many gas stations," further suggesting a history of business and contractual experience. (SAC ¶ 14.) Both facts weigh in favor of Defendant's position. In support of the negotiability factor, Defendant attaches copies of correspondence with Plaintiff's counsel before the signing of the Franchise Agreement as proof that Plaintiff engaged counsel to review the agreement before signing the waivers. (*See* Def.'s Mem. re Mot. To Strike Ex. B (Dkt. No. 42-

---

[7] Although the law is not explicit about what kinds of evidence a court may consider when deciding a motion to strike a jury demand pre-discovery, courts have indicated that they generally consider the exhibits attached to the motion and memoranda. *See, e.g.*, *Webster Chrysler Jeep, Inc. v. Chrysler Holding LLC*, No. 08-CV-6535, 2012 WL 1113684, at *2–4 (W.D.N.Y. Mar. 30, 2012) (noting that the court considered "the papers and exhibits filed in connection with the [motion to strike jury demand]" where parties had thus far only filed pleadings and amended pleadings); *Adelphia Recovery Tr. v. Bank of Am., N.A.*, No. 05-CV-9050, 2009 WL 2031855, at *4 (S.D.N.Y. July 8, 2009) (considering attached exhibits, including the agreement and related communication when deciding motion to strike jury demand); *Morgan Guar. Tr. Co.*, 36 F. Supp. 2d at 602, 604–05 (considering attached exhibits in a motion to strike jury demand where complaint and counterclaim had been filed).

Accordingly, the Court will consider any exhibits attached to the Complaint and/or moving papers, including the contract itself, and related correspondence.

2).)  Although Plaintiff argues that "Defendant has failed to demonstrate that" any particular

provision of the agreement was "successfully negotiated," (Pl.'s Mem. re Mot. To Strike 5), just

because a party "did not attempt to negotiate its provisions does not mean that, in fact, the waiver

or other terms in the note were not negotiable," *Morgan Guar. Tr. Co.*, 36 F. Supp. 2d at 604; *see*

*also Wechsler v. Hunt Health Sys., Ltd.*, No. 94-CV-8294, 2003 WL 21878815, at *3–4

(S.D.N.Y. Aug. 8, 2003) (noting that "negotiability" can be "evidenced . . . by [having the]

opportunity to review and revise the documents and provisions at issue prior to signing them"),

*denying reconsideration*, 285 F. Supp. 2d 343 (S.D.N.Y. 2003).  Nothing about Plaintiff's

allegations suggests that Plaintiff "did not have any choice but to accept the [] contract as

written."  *Nat'l Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 2011).  Overall, the

negotiability factor favors Defendant, and is, at most, neutral.

Turning to the conspicuousness factor, the contract contains bold text in all capital letters

immediately above the signature line directing the reader to the full text of the jury waiver

provision.  (*See* Franchise Agreement at Signature Page.)  The language was not "deeply and

inconspicuously [buried] in the contract," so this factor also favors Defendant.  *Nat'l Equip.*

*Rental,* 565 F.2d at 258.  The last factor is the comparative bargaining power of the two parties;

here, the relative bargaining power between Plaintiff, a small business, and Defendant, a large

corporation, was different, but the fact that one party was a smaller entity than the other does not

by itself establish an inequality significant enough to invalidate a jury waiver provision.  This is

especially true when, as here, Plaintiff has business experience in this space before dealing with

Defendant.  *See Morgan Guar. Tr. Co.*, 36 F. Supp. 2d at 604 ("[A]lthough there was clearly a

difference in bargaining power between the sides—as there would be between a major

[corporation] and virtually any [] individual[]—[the individual was] not [a] financial

neophyte[].").  Plaintiff was also represented by counsel when it signed the Franchise

Agreement, further indicating that the bargaining power between the two parties was not so vast

as to require invalidation of the pertinent waivers.  Indeed, Defendant sent drafts to Plaintiff's

counsel for review, as indicated by the correspondence attached to Defendant's Motion To Strike

Plaintiff's Demand for a Jury Trial.  (*See generally* Def.'s Mem. re Mot. To Strike Ex. B.)  "That

[the signatory] was represented by counsel and that [the] attorney would approve the [contract]

prior to closing certainly suggests that the [signatory] had the opportunity to participate in

negotiations."  *Lehman Bros.*, 801 F. Supp. 2d at 231 (citing *Adelphia Recovery Trust*, 2009 WL

2038155, at *4).

After weighing the relevant factors, the Court concludes that the jury waiver was entered

into "knowingly, intentionally, and voluntarily."  *Merrill Lynch*, 500 F.3d at 188; *see, e.g.*,

*Webster Chrysler Jeep*, 2012 WL 1113684, at *6–8 (upholding jury waiver where signatory was

an "experienced businessman," the waiver was in all capital letters, and "there was not a gross

inequality in bargaining power between the parties"); *Price*, 808 F. Supp. 2d at 705–06 (holding

that a jury waiver was entered into knowingly and voluntarily where one of the factors weighed

strongly in favor of the party enforcing the waiver, two slightly favored the signatory, and one

was neutral); *Adelphia Recovery Trust*, 2009 WL 2031855, at *4–5 (enforcing jury waiver where

the provision was conspicuous, the signatory had counsel, and the signatory had "business

acumen" through entering similar previous agreements).

Plaintiff further argues that the scope of the jury waiver, even if enforceable, applies only

to the breach of contract claim and not to the "remaining eight causes of action sounding in

fraud, violations of the general business law and franchise law."  (*See* Letter from Ronald D.

Degen, Esq. 2 (Dkt. No. 46.).)  However, in *Merrill Lynch*, the Second Circuit made clear that

"unless a party alleges that its agreement to waive its right to a jury trial was itself induced by fraud, the party's contractual waiver is enforceable vis-à-vis an allegation of fraudulent inducement relating to the contract as a whole." *Merrill Lynch*, 500 F.3d at 188. Plaintiff made no such allegation about the jury waiver provision. (*See generally* SAC.) All the allegations and claims for relief center around Plaintiff's general contractual relationship with Defendant. Even when "narrowly construed," *see Morgan Guar. Trust. Co.*, 36 F. Supp. 2d at 603, the jury waiver applies to all of Plaintiff's claims because the provision applied to "Dispute Resolution" generally, (*see* Franchise Agreement § 15). Accordingly, the Court strikes Plaintiff's jury demand.

### 2. Punitive Damages and Lost Profits

"Limitation on liability provisions routinely are agreed upon by parties to contracts and enforced by courts inasmuch as they 'represent[] the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed . . . .'" *In re Lehman Bros. Holdings Inc*., 544 B.R. 62, 70 (Bankr. S.D.N.Y. 2015) (quoting *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc*., 643 N.E.2d 504, 507 (1994)). As long as the provisions waiving the right to claim lost profits and punitive damages are set forth clearly in the agreement between the parties and the agreement was "knowingly, voluntarily and intentionally" entered into, such waivers will be enforced. *See Coraud LLC v. Kidville Franchise Co., LLC*, 109 F. Supp. 3d 615, 624–25 (S.D.N.Y. 2015) (enforcing damages waiver provision and dismissing demand for punitive and exemplary damages).

Explicit waivers of punitive and lost profit damages like the one at issue here are routinely upheld by courts. *See, e.g.*, *In re Lehman Bros.*, 544 B.R. at 70 (denying punitive and consequential damages where clause in credit agreement waived them); *E*TRADE Fin. Corp. v.*

*Deutsche Bank AG*, No. 05-CV-902, 2008 WL 2428225, at *27 (S.D.N.Y. June 13, 2008)

(enforcing clause in contract that specified that no party would be "liable to the other for

consequential, incidental[,] or punitive damages"); *Rubin v. Telemet Am. Inc.*, 698 F. Supp. 447,

450 (S.D.N.Y. 1988) (denying consequential damages where contract waived right to receive

them). Additionally, as discussed above, the conspicuousness of the clause, Plaintiff's business

experience, and the fact that Plaintiff was represented by counsel, who reviewed the agreement

before the signing, all suggest that the waiver was "knowing[], voluntar[y], and intentional[]."

*Coraud*, 109 F. Supp. 3d at 624 (citation and quotation marks omitted.)

Plaintiff points to the fact that a claim under NYGBL § 349 would permit punitive

damages. (*See* Pl.'s Mem. re Mot. To Strike 9.) However, Plaintiff's claim under that statute

does not survive Defendant's Motion To Dismiss, as discussed below. Plaintiff also argues that

punitive damages are available for fraudulent inducement. (*Id*. at 10.) Punitive damages under

this theory, however, are only available when the alleged fraud is "aimed at the public

generally." *Citibank, N.A. v. Itochu Int'l Inc.*, No. 01-CV-6007, 2003 WL 1797847, at *5

(S.D.N.Y. Apr. 4, 2003) (collecting cases); *see also Zarour v. Pac. Indem. Co.*, 113 F. Supp. 3d

711, 718 (S.D.N.Y. 2015) ("In order to state a claim for punitive damages [under New York

law], [the] plaintiffs' allegations must establish the following: (1) [the] defendant's conduct must

be actionable as an independent tort; (2) the tortious conduct must be of an egregious nature; (3)

the egregious conduct must be directed to [the] plaintiff; and (4) it must be part of a pattern

directed at the public generally." (citation and quotation marks omitted)). Plaintiff's conclusory

statements and citation to one hyperlink, (Pl.'s Mem. re Mot. To Strike 11–12), do not plausibly

allege that "a high degree of moral turpitude" or "wanton dishonesty" is present here. *Citibank*,

2003 WL 1797847, at *5. Instead, "[t]his was a contact between two private parties, where the

alleged harm befell one of the parties." *Id*. Plaintiff is therefore not eligible for punitive damages under this argument either.

Accordingly, the Court also strikes Plaintiff's request for punitive damages and lost profits.

B. Motion to Dismiss

1. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

### 2. Fraud in the Inducement / Intentional Misrepresentation

Defendant argues that Plaintiff's fraud in the inducement/intentional misrepresentation claim must be dismissed because it is (a) duplicative of Plaintiff's breach of contract claim, (b) time-barred, and (c) not pleaded with the requisite particularity. (Def.'s Mem. re Mot. To Dismiss 5–11.) The Court addresses each argument in turn to the extent necessary.

### a. Duplicative Claims

Defendant argues that Plaintiff's fraud in the inducement/intentional misrepresentation claim fails because it is simply a restatement of Plaintiff's breach of contract claim. (Def.'s Mem. re Mot. To Dismiss 5–9.)

"New York law does not recognize claims that are essentially contract claims masquerading as claims of fraud." *W.B. David & Co. v. DWA Commc'ns, Inc.*, No. 02-CV-8479, 2004 WL 369147, at *3 (S.D.N.Y. Feb. 26, 2004) (quotation marks omitted). Indeed,

> [i]n a case involving a breach of contract, a fraud claim may arise only where the alleged misrepresentations concern a matter separate from the contract obligations themselves. In other words, a fraud claim may exist only where the alleged misrepresentations concern a 'present' fact (i.e., the financial stability of the company) as opposed to a statement of future intent (i.e., that something will be provided as part of the proposed contract).

*Microtel Franchise & Dev. Corp. v. Country Inn Hotel*, 923 F. Supp. 415, 417 (W.D.N.Y. 1996) (citation omitted). When a claim of fraudulent inducement is brought with a breach of contract claim, the two must be "sufficiently distinct" and the plaintiff must: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted). The fraud claim cannot survive unless it fits into one of these three exceptions. *See id.*; *see also Atla–Medine v. Crompton Corp.*, No. 00-CV-5901, 2001 WL 170666, at *3 (S.D.N.Y. Feb. 21, 2001) (same).

Defendant argues that Plaintiff has failed to establish any collateral or extraneous misrepresentation, has failed to allege any duty separate from that under the Franchise Agreement, and seeks the same relief under both counts. (Def.'s Mem. re Mot. To Dismiss 8.) Plaintiff counters that it did allege that Defendant breached a legal duty separate from the duty to perform under the contract. (Pl.'s Mem. re Mot. To Dismiss 11–12.) Specifically, Plaintiff points out that "New York recognizes a cause of action to recover damages for fraud based on concealment, where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is rendered inherently unfair." *Canon U.S.A., Inc. v. Cavin's Bus. Sols., Inc.*, 208 F. Supp. 3d 494, 503 (E.D.N.Y. 2016) (quoting *Miele v. Am. Tobacco Co.*, 770 N.Y.S.2d 386, 391 (App. Div. 2003)). Plaintiff argues that Defendant had a

legal duty to speak to the adequacy of Plaintiff's location in the Westchester Airport, as nothing in the Franchise Agreement indicated that additional space would be necessary in order for Plaintiff to begin operating its franchise store. (Pl.'s Mem. re Mot. To Dismiss 11.) Instead, Defendant allegedly misrepresented "that the Westchester Airport was a suitable and acceptable location for a successful Dunkin franchise restaurant," (SAC ¶ 59(d)), and said nothing else about the appropriateness of the space Plaintiff had leased. Plaintiff points out that this allegation in particular is one about a present fact at the time the Agreement was signed, and did not relate to future contract performance. (Pl.'s Mem. re Mot. To Dismiss 9–10.)

Plaintiff also argues that Defendant concealed from Plaintiff that Plaintiff would be required to conduct business with competing franchisors, even though Defendant had arrangements like the one it later allegedly pushed Plaintiff into with the Beekman Group, with other similar stores. (Pl.'s Mem. re Mot. To Dismiss 12 (citing SAC ¶ 32).) Specifically, Plaintiff alleges that in April 2011, a representative for Plaintiff and Defendant's Vice President of Operations, Wiggins, met to discuss the franchise. (SAC ¶ 17.) Plaintiff alleges that at that time the Parties discussed Plaintiff expanding its operations to include parbaking and having a "just baked on demand . . . option" available to it. (*Id*.) Based on this understanding that Plaintiff could bake goods on its own premises, Plaintiff secured additional space at the Westchester airport, purchased additional equipment, and signed the Amendments. (SAC ¶¶ 17–19.) Subsequently, however, Plaintiff was made to buy its baked goods from the Beekman Group. (*Id.* ¶ 31.) Plaintiff alleges that Defendant misrepresented that Plaintiff would produce and sell Plaintiff's own baked goods. (SAC ¶ 59(f).)

Plaintiff further argues that Defendant made fraudulent misrepresentations collateral or extraneous to the Franchise Agreement to induce Plaintiff to enter into the Franchise Agreement.

(Pl.'s Mem. re Mot. To Dismiss 12.)  For example, Plaintiff alleges that Defendant represented

that the relationship between Plaintiff and Defendant would be a long-term relationship that

would exceed the terms of the Franchise Agreement.  (*Id.* (citing SAC ¶ 14).)  Plaintiff also

alleges that Defendant misrepresented that Plaintiff "would be a part of the premier franchise

team (*i.e.* relating to airports and train stations) and not the general business team (dealing with

single store franchises)."  (SAC ¶ 59(g).)  Plaintiff argues that these misrepresentations go not

only to the performance of the Agreement, but to why Plaintiff entered into the agreement in the

first place.  (Pl.'s Mem. re Mot. To Dismiss 12.)[8]

The Court agrees with Plaintiff that it has alleged enough misrepresentations that are

collateral to the Franchise Agreement and that were specifically intended to induce it to enter

into the Franchise Agreement for the fraud claim to survive.  Plaintiff's allegation that it was

misled to believe that it could open the Store anywhere within Westchester Airport, and that it

believed it was establishing a long-term relationship with Defendant that would outlast the

Franchise Agreement are enough to distinguish the fraud claim from the breach of contract

claim.  That Defendant later failed to help Plaintiff secure a specific space within the Airport, or

imposed different specifications and plans for the Store, or failed to provide the assistance and

training Plaintiff needed for the Store to survive in breach of the Agreement, are separate from

what Plaintiff was told before it entered into the Franchise Agreement.  *See Cougar Audio, Inc.*

*v. Reich*, No. 99-CV-4498, 2000 WL 420546, at *6 (S.D.N.Y. Apr. 18, 2000) (stating that fraud

claims have survived along with breach of contract claims where they are based on a

---

[8] Plaintiff also argues that Defendant caused damages separate from those related to the contract breach and offers the damaged relationship Plaintiff suffered with the Westchester Airport as an example.  (Pl.'s Mem. re Mot. To Dismiss 13.)  This argument falls flat, however, because the damaged relationship with the Westchester Airport is one of the allegations and type of damages specifically listed under the breach of contract claim.  (SAC ¶ 55(m).)

misrepresentation that induced the other party to enter into the contract); *see also N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 767–68 (N.Y. 1995) (citing examples of conduct sufficiently collateral to state a claim in tort, including fraudulently inducing the plaintiff to enter into the contract and engaging in conduct to defeat the contract); *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004–05 (N.Y. 1986) (holding that fraud claim was not duplicative of breach of contract claim where buyer made misrepresentations that it would abide by certain geographical restrictions in order to induce seller to enter into the contract).

However, to the extent Plaintiff bases its fraud in the inducement claims on representations made in the Franchise Agreement that are also the bases for Plaintiff's breach of contract claim, those claims are duplicative. *See Town of Haverstraw v. Columbia Elec. Corp.*, 237 F. Supp. 2d 452, 456 (S.D.N.Y. 2002) ("The statement on which [plaintiff] bases its fraud claim is the exact statement that the [plaintiff] claims created the contract or at least a supplement to the original agreement. Even though the breach of contract claim and the fraud claim are pleaded in the alternative, it does not follow that the fraud claim is collateral to the alleged breach of contract." (citation omitted)). For example, the provision of the Franchise Agreement, that Defendant had "experience and skill in the continued development of the Dunkin' Donuts System," involving, among other things, "development" and "operation," (SAC ¶ 37), and the provision that set out that Defendant would "maintain a continuing advisory relationship with [Plaintiff], providing such assistance . . . regarding the development and operation of the Store . . . . [Defendant] will advise . . . on all aspects of Store operations," (*id.* ¶ 38), are the bases of the fraud in the inducement claims alleging Defendant misrepresented its expertise, and failed to train and support Plaintiff. (SAC ¶¶ 59 (a)–(c), (e).) Those same provisions, however, are also the bases for the various allegations in the breach of contract claim

that Defendant failed to comply with the terms of the Franchise agreement, and failed to provide Plaintiff with proper training, supervision, and advice.  (*See* SAC ¶ 55.)

Accordingly, the Court concludes that Plaintiff's fraud in the inducement / intentional misrepresentation claim is not duplicative of Plaintiff's breach of contract claim with respect to misrepresentations allegedly made to induce Plaintiff to enter the agreement, and to induce Plaintiff to sign the Amendments.  Plaintiff's fraud in the inducement claim is duplicative inasmuch as it relies on representations made in the Franchise Agreement that are also the bases for Plaintiff's breach of contract claim.

<u>b.  Statute of Limitations</u>

Defendant next argues that Plaintiff's fraud in the inducement/intentional misrepresentation claim is barred by the statute of limitations.  (Def.'s Mem. re Mot. To Dismiss 9–11.)

"[T]he statute of limitations is an affirmative defense, the determination of which requires a consideration of the merit of both parties' claims and defenses."  *Garcia v. Pancho Villa's of Huntington Vill., Inc.*, 268 F.R.D. 160, 166 (E.D.N.Y. 2010) (citation omitted). "Because a statute of limitations defense can be highly fact dependent, a motion to dismiss is often not the appropriate stage to raise affirmative defenses like the statute of limitations." *Canon*, 208 F. Supp. 3d at 501 (citation, alteration, and quotation marks omitted).  Therefore, "[d]istrict courts have not dismissed actions as untimely on Rule 12(b)(6) motions unless the complaint shows clearly that a claim is not timely."  *Id*. (citation and quotation marks omitted).

Pursuant to New York Civil Practice Law and Rules § 213(8), the time within which "an action based upon fraud . . . must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the

plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8).

Defendant points out that six of the seven specific allegations outlined in Count Two concern some aspect of training, advice, or support Defendant allegedly failed to provide Plaintiff pursuant to the original Franchise Agreement. (*See* SAC ¶¶ 59(a)-(e), (g).) Defendant argues that "all of these alleged acts would have . . . arisen at or around the time Plaintiff entered into the Franchise Agreement in June 2010 . . . and would be barred by New York's six-year statute of limitations . . . ." (Def.'s Mem. re Mot. To Dismiss 10.) Defendant further contends that Plaintiff discovered the fraud no later than August 2015 when the Franchise Agreement was terminated. (*Id.*) However, Plaintiff does not identify a termination date for the Agreement, and Defendant submits no evidence the Court may consider at this stage to show that the Agreement was terminated in August 2015. With respect to Plaintiff's allegation that Defendant misrepresented that Plaintiff would be able to produce and sell its own baked goods rather than having to purchase them from the Beekman Group, (SAC ¶ 59(f)), Defendant argues that Plaintiff executed a Supplier Agreement with the Beekman Group on January 7, 2012, and therefore Plaintiff's claim accrued on that date. (Def.'s Mem. re Mot. To Dismiss 10.) However, Plaintiff does not allege it entered a Supplier Agreement with the Beekman Group, and the Court does not consider Defendant's submission of the Supplier Agreement. Accordingly, the Court also cannot conclude that Plaintiff's claim accrued on January 7, 2012. *See Ortiz v. City of New York*, 755 F. Supp. 2d 399, 401 (E.D.N.Y.2010) (stating that because a statute of limitations defense can be highly fact dependent, "[a] motion to dismiss is often not the appropriate stage to raise affirmative defenses like the statute of limitations"). The Court thus cannot at this stage dismiss Plaintiff's SAC because questions of fact remain as to when

Plaintiff's claims accrued.[9]  Inasmuch as Plaintiff's fraud in the inducement claim survives, discovery will initially be limited to determining when Plaintiff's claim accrued and whether Plaintiff timely brought this Action.

### c.  Particularity

Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  To comply with this rule, a complaint must: "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (citation omitted); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (same); *Jovel v. i-Health, Inc.*, No. 12-CV-5614, 2013 WL 5437065, at *11 (E.D.N.Y. Sept. 27, 2013) ("Rule 9(b) generally requires that a plaintiff specify the who, what, where, when[,] and why of the alleged fraud; specifying which statements were fraudulent and why, who made the statements to whom, and when and where the statements were made." (citing

---

[9] Plaintiff notably does not deny that it executed a Supplier Agreement with Beekman on January 7, 2012, or that the Franchise Agreement terminated in August 2015.  Plaintiff instead argues that it is entitled to discovery because "there is a question of fact regarding when [Defendant] disclosed [Plaintiff's] requirement to purchase all of its baking goods from Beekman Group under the Product Supplier Agreement signed on January 7, 2012."  (Pl.'s Mem. re Mot. To Dismiss 19.)  Plaintiff also notably does not argue that there is a factual dispute with respect to the termination date of the Franchise Agreement.

Plaintiff separately argues that it is entitled to equitable estoppel and that the statute of limitations should be tolled.  (*Id*. at 19–21.)  Plaintiff broadly argues that Defendant made material misrepresentations to Plaintiff in 2010, 2012, and 2015.  (*Id*. at 20.)  The Court need not consider Plaintiff's alternative argument at this stage because it concludes that it cannot dismiss the SAC on statute of limitations grounds.  As noted above, limited discovery as to when Plaintiff's claims accrued and whether Plaintiff timely filed the Complaint may resolve some of these questions of fact.

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). These details principally serve to provide a defendant with "fair notice of a plaintiff's claim." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991). Rule 9(b) applies broadly to claims "premised on allegations of fraud," *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citation omitted); *see also Police & Fire Ret. Sys. of City of Detroit v. Goldman, Sachs & Co*., No. 10-CV-4429, 2014 WL 1257782, at *5 (S.D.N.Y. Mar. 27, 2014) (same), i.e., "to all averments of fraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation and quotation marks omitted), and "is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action," *Rombach*, 355 F.3d at 171; *see also Meserole v. Sony Corp. of Am., Inc.*, No. 08-CV-8987, 2009 WL 1403933, at *3 (S.D.N.Y. May 18, 2009) (explaining that Rule 9(b) applies "not only to formal averments of fraud, but also to allegations that sound in fraud, or where the wording and imputations of the complaint are classically associated with fraud" (citation and quotation marks omitted)).

Defendant argues that in each of the identified alleged fraudulent misrepresentations listed in SAC ¶ 59, Plaintiff "fails to state the identity of the speaker of the alleged fraudulent statement, the time and place of the alleged fraudulent statement, and, importantly, how the alleged statements were fraudulent." (Def.'s Mem. re Mot. To Dismiss 11–12.) Defendant argues that the most specific allegation made by Plaintiff regarding any statement is made concerning correspondence between Plaintiff and Defendant's Vice President, Bob Wiggins, but that Plaintiff fails to explain how Wiggins's statements were fraudulent. (*Id*. (citing SAC ¶ 17).)

Defendant's characterization is not quite correct—Plaintiff alleges Wiggins's statements were fraudulent in that he discussed with Plaintiff the possibility of Plaintiff expanding its

operations to include parbaking and having a "just baked on demand . . . option" available to it. (SAC ¶ 17.)  Plaintiff allegedly secured additional space at the Westchester airport, purchased additional equipment, and entered into the Amendment based on this representation.  (*Id*. ¶¶ 17–19.)  Subsequently, however, Plaintiff was made to buy its baked goods from the Beekman Group.  (*Id*. ¶ 31.)  Plaintiff alleges that Defendant misrepresented that Plaintiff would produce and sell Plaintiff's own baked goods.  (*Id*. ¶ 59(f).)  Plaintiff further alleges that Defendant forced Plaintiff to purchase all baked goods from Beekman Group because the Westchester Airport was located within "Beekman Group's area," and that Defendant never disclosed this information to Plaintiff prior to it entering into the Franchise Agreement.  (*Id*. ¶ 31.)  Moreover, Plaintiff alleges Defendant had similar arrangements with other bakeries, and forced its franchisors elsewhere into similar agreements.  (*Id*. ¶ 32.)  That Defendant allegedly knew Westchester Airport was in the Beekman Group area plausibly supports the inference that Defendant, and therefore its Vice President, knew Plaintiff would be obligated to purchase baked goods from the Beekman Group.  Thus, with respect to Plaintiff's allegations regarding how it was induced to sign the First Amendment, Plaintiff adequately specifies the statement, the speaker, and explains why the statement was fraudulent.  *See Capax Discovery, Inc. v. AEP RSD Inv'rs, LLC*, 285 F. Supp. 3d 579, 588–99 (W.D.N.Y. 2018) (holding that plaintiff pled fraud with sufficient particularity to state claims for fraudulent inducement against seller, where plaintiff alleged that sellers fraudulently inflated the archiving company's financial performance and contractual relationships, and specified the statements that buyers contended were fraudulent).

However, Defendant is correct that with respect to the statement about Westchester Airport being a suitable location for the Store, and the statement about Defendant and Plaintiff

entering into a long-term relationship that went beyond the Franchise Agreement, Plaintiff does not allege who made these representations, or when or where they were made—no details whatsoever are alleged. Moreover, Plaintiff does not allege Defendant knew these statements were false when they were made. Accordingly, Plaintiff does not plead its fraud in the inducement claims with respect to being induced to enter the Franchise Agreement with sufficient particularity. *See Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 346–48 (E.D.N.Y. 2014) (dismissing fraud and fraudulent inducement claims where franchisees failed to adequately allege how and/or why information franchisor's managing member provided them concerning franchise system was false and misleading, and their allegations of fraud were not accompanied by statement of facts); *Pullman v. Alpha Media Pub., Inc.*, No. 12-CV-1924, 2013 WL 1290409 (S.D.N.Y. Jan. 11, 2013) (dismissing fraud claim because, inter alia, statement that defendant "knew" statements were false "lack[ed] allegations to support it"), *report and recommendation adopted*, No. 12-CV-1924, 2013 WL 1286144, at *23 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 624 F. App'x 774 (2d Cr. 2015).

Accordingly, Plaintiff's fraud in the inducement / intentional misrepresentation claim survives only with respect to Plaintiff's allegation that it was induced into expanding the Store, acquiring equipment, and signing the Amendments based on the misrepresentation that it would be able to bake goods on its own premises.

### 3. NYGBL § 349 Deceptive Acts and Practices Claim

Defendant argues that Plaintiff's NYGBL § 349 claim fails because Plaintiff alleges a private dispute, and the statute requires that the conduct alleged was directed at consumers at large. (Def.'s Mem. re Mot. To Dismiss 14.)

NYGBL § 349(a) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."  N.Y. Gen. Bus. Law § 349(a).  "To successfully assert a [§ 349] claim, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *City of New York v. Smokes-Spirits.com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009); *accord Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010).  "As a threshold matter, in order to satisfy . . . § 349, plaintiffs' claims must be predicated on a deceptive act or practice that is 'consumer oriented.'"  *Gaidon v. Guardian Life Ins. Co. of Am.*, 725 N.E.2d 598, 603 (N.Y. 1999) (citation omitted).  To be "consumer oriented," the alleged conduct "must have a broad impact on consumers at large."  *N.Y. Univ.*, 662 N.E.2d at 770 (citation omitted).  Section 349, therefore, requires that the conduct bear some relationship to consumer transactions.  *See N. State Autobahn, Inc. v. Progressive Ins. Grp.*, 953 N.Y.S.2d 96, 102 (App. Div. 2012) ("The requirement that the consumer-oriented conduct be materially misleading limits the availability of [§ 349] to cases where the deception pertains to an issue that may bear on a consumer's decision to participate in a particular transaction.  As such, the statute is limited in its application to those acts or practices which undermine a consumer's ability to evaluate his or her market options and to make a free and intelligent choice.").  It does not apply to private disputes between individual parties with no bearing on the overall marketplace.  *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995) ("Private contract disputes, unique to the parties, . . . would not fall within the ambit of [§ 349].").

Here, Plaintiff has failed to plead conduct related to consumer transactions, and it has failed to plead conduct that impacts consumers at large.  All of the alleged deceptive acts,

ranging from Defendant's failure to disclose that Plaintiff would be required to purchase baked goods from the Beekman Group, (SAC ¶ 31), to Defendant's failure to help Plaintiff secure the new lease at Westchester Airport, (*id*. ¶¶ 40–41), were targeted at Plaintiff. No mention is made of consumers or the public at large. Plaintiff's allegations primarily concern injuries it sustained from Defendant's alleged breach of contract and misrepresentations to Plaintiff specifically, which is insufficient. *See Silverman v. Household Fin. Realty Corp. of N.Y.*, 979 F. Supp. 2d 313, 318 (E.D.N.Y. Aug. 5, 2013) (dismissing § 349 claim because "[p]laintiffs' allegations [were] specific to them and their individual . . . transaction," such that "[t]heir claims derive[d] from the particular circumstances," and "the allegedly deceptive practices . . . [did] not universally apply to other [transactions] or impact the public at large" (citation omitted)); *see also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("[T]he gravamen of [a § 349 claim] must be consumer injury or harm to the public interest." (citation omitted)).

The only conduct in the SAC that could plausibly be interpreted to relate to consumers or the public is Plaintiff's allegation that "[u]pon information and belief, [Defendant] has similar arrangements with other bakeries, and forces its franchisors [sic] elsewhere into similar agreements with similar stores with whom Dunkin does business." (SAC ¶ 32.) However, such generic averments "fall far short" of the standard necessary to state a claim under NYGBL § 349. *See Sichel v. UNUM Provident Corp*., 230 F. Supp. 2d 325, 331 (S.D.N.Y. 2002) (dismissing NYGBL § 349 claim stating "[t]hey simply take the facts of [the plaintiff]'s second claim and assert that the defendants do this all the time. There is no factual support offered for this allegation."); *Tinlee Enters., Inc. v. Aetna Cas. & Sur. Co.*, 834 F. Supp. 605, 609–10 (E.D.N.Y.

1993) (dismissing NYGBL § 349 claim when based "[u]pon information and belief, defendant has taken actions of a similar nature to those herein in handling of other similar claims."). [10]

The Court therefore finds that Plaintiff has failed to plead a claim under New York's General Business Law § 349, and grants Defendant's Motion To Dismiss that claim. [11]

### 4. General Waiver

Defendant finally argues that Plaintiff's claims relying on conduct that occurred before January 20, 2012, must be dismissed, because Plaintiff executed a general release on that day in the First Amendment. (Def.'s Mem. re Mot. To Dismiss 16–17.) Indeed, "New York law . . . recognizes that 'a clear and unambiguous release . . . should be enforced according to its terms.'" *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 189 (S.D.N.Y. 2008) (quoting *Booth v. 3669 Delaware*, 703 N.E.2d 757, 758 (N.Y. 1998)). "[W]hen a release is clear and unambiguous on its face and knowingly and voluntarily entered into, it will be enforced as a private agreement between the parties." *Kraft Foods, Inc. v. All These Brand Names, Inc.*, 213 F. Supp. 2d 326, 330 (S.D.N.Y. 2002) (quoting *L & K Holding Corp. v. Tropical Aquarium*, 596 N.Y.S.2d 468, 469 (App. Div. 1993)). However, all of the cases Defendant cites were decided at the summary judgment or trial stage, where the court could

---

[10] Plaintiff cites cases for the proposition that New York courts have recognized § 349 claims tied to franchise agreements when the plaintiff's allegations concern a franchise marketing scheme causing an impact on consumer at large, or when a reasonable consumer would have been misled by the defendant's conduct. (Pl.'s Mem. re Mot. To Dismiss 15–17 (citing *Akgul v. Prime Time Transp., Inc*., 741 N.Y.S.2d 553, 557 (App. Div. 2002); *Oswego Laborers'*, 647 N.E.2d at 745). Plaintiff, however, fails to point to any allegations in the SAC that suggest that this case involves a franchising marketing scheme. Plaintiff also fails to point to any allegations that consumers would have been misled under the circumstances in this case.

[11] Because the Court has dismissed Plaintiff's claim in the entirety, it need not consider Defendant's separate argument that Plaintiff's claim under New York's General Business Law § 349 must be dismissed because it is time barred. (Def.'s Mem. re Mot. To Dismiss 12.)

determine based on the record before it that plaintiff executed the general release knowingly and voluntarily. It is true that Plaintiff has made no allegation that the General Release was procured by fraud, duress, or undue influence. However, there is simply no evidence in the record at this stage based on which this Court can determine as a matter of law that Plaintiff signed the general release knowingly and voluntarily.

Accordingly, the Court will not dismiss Plaintiff's claims based on conduct predating January 20, 2012, at this stage. *See Pesserillo v. Nat'l Grid*, 78 F. Supp. 3d 551, 555 (E.D.N.Y. 2015) (denying motion to dismiss on grounds of general release where "[a]t this point in the litigation, it is not possible for the [c]ourt to determine whether [the] [p]laintiff's waiver of his discrimination claims was done knowingly and willfully. The consideration of the foregoing . . . involves a fact-intensive inquiry that cannot be undertaken at this juncture simply . . . [because] Plaintiff has not pleaded any facts pertaining to the execution of the [a]greement . . . ."); *Lamberti v. Motorola Sols., Inc*., No. 12-CV-2472, 2013 WL 166367, at *3–6 (S.D.N.Y. 2013) (denying motion to dismiss on grounds of general release because it was "premature to conclude that plaintiff's waiver was knowing and voluntary").

## III. Conclusion

For the foregoing reasons, the Court grants Defendant's Motion To Strike Plaintiff's Demand for a Jury Trial and Request for Lost Profits and Punitive Damages, grants Defendant's Motion To Dismiss with respect to Plaintiff's claim under NYGBL § 349, and grants Defendant's Motion To Dismiss with respect to Plaintiff's fraud in the inducement/intentional misrepresentation claim, except for Plaintiff's allegation that Defendant misrepresented that Plaintiff would bake and sell goods on its own premises with the equipment it was required to purchase to operate the Store.

The claims that are dismissed are dismissed with prejudice, as Plaintiff has already twice amended, including in response to Defendant's pre-motion letters. *Justice v. McGovern*, No. 11-CV-5076, 2013 WL 1809634, at *3 (E.D.N.Y. Apr. 29, 2013) ("Although when a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint, when the plaintiff is put on notice of the deficiencies in his complaint and fails to correct them in the amended complaint[,] dismissal with prejudice is proper" (citation, some alterations, and quotation marks omitted)); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 344 (S.D.N.Y. 2011) ("[A]s plaintiff has already amended his complaint twice, dismissal with prejudice is appropriate at this stage in the litigation." (collecting cases)).

Because discovery is needed to ascertain the timeliness of Plaintiff's claims, within 10 days of the date of this Opinion & Order, the Parties are to submit a proposed discovery schedule for limited discovery.

The Clerk of Court is respectfully directed to terminate the pending Motions. (*See* Dkt. Nos. 36, 38.)

Dated:     September **16**, 2019
           White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

35